UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------
                                              :
UNITED STATES OF AMERICA,          :
                                              :        CASE NO. 5:10-CR-00290
            Plaintiff,                    :
                                              :
vs.                                           :        SENTENCING MEMORANDUM
                                              :
SAMUEL R. CICCOLINI,                :
                                              :
            Defendant.                    :
                                              :
------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

        With this sentencing opinion, the Court seeks to provide a thorough explanation of its

sentence of Defendant Samuel R. Ciccolini.

## I. Factual Findings

        This case presents the Court with a very unusual set of facts.  On July 13, 2010, the United

States filed an information charging Defendant Samuel Ciccolini with one count of structuring bank

transactions to evade reporting requirements in violation of 31 U.S.C. § 5324(a)(3) and one count

of making a false income tax return in violation of 26 U.S.C. § 7206(1).  [Doc. 1.]  On July 23, 2010,

the Defendant pled guilty to both counts.  [Doc. 4.]  On October 20, 2010, Defendant Ciccolini

appeared before this Court for sentencing.

        Defendant Ciccolini is an ordained Catholic priest.  Although assisting with a parish, he has

spent most of his working efforts in social welfare programming.  He was formerly the Executive

Case No. 5:10-CR-00290
Gwin, J.

Director of the Interval Brotherhood Home, a residential drug and rehabilitation center, located in

Akron, Ohio.  The Defendant founded the Interval Brotherhood Home in 1970 and has remained

closely involved in its operation.  Ciccolini was also the president of the S.R. Ciccolini, Interval

Brotherhood Home Foundation, Inc.  He started the Foundation in 1988 to primarily raise funds to

support the Interval Brotherhood Home.  The Foundation is funded primarily from contributions,

fund-raising activities, and state grants.  Throughout its existence, Ciccolini played a major role in

its fund-raising efforts.  Prior to the filing of these charges, Defendant Ciccolini retained nearly sole

and exclusive control over both the Interval Brotherhood Home and its supporting Foundation.

Over time, the Interval Brotherhood Home became a very successful charity.  It employs

more than eighty full and part time employees to provide treatment services to as many sixty-four

men and women on a daily basis.  With a 2010 budget of $4.7 million, the Interval Brotherhood

Home receives its base funding from the Summit County Mental Health Board.  Despite this public

source of funding for ongoing operations, Ciccolini and the Foundation sought, and then hoarded,

huge amounts of donations.  The Foundation has completely paid all costs associated with its

purchase and improvement of the Home's facilities and has liquid assets of $13.6 million, almost

enough to totally fund the charity for three years even if all state support stopped and no additional

donations were received.

The conduct underlying the charged offenses occurred during 2003 and 2004.  From April

2003 to June 2003, the Defendant deposited $1,038,680 in cash into his bank accounts in 139

separate transactions of less than $10,000.  The Defendant admitted that he structured the

transactions to evade bank reporting requirements.  31 U.S.C. § 5324(a)(3).  When asked where the

money came from, the Defendant claims that he held more than a million dollars in cash in his room

Case No. 5:10-CR-00290
Gwin, J.

at the Immaculate Conception Church Rectory and that he only decided to deposit this money in 2003 because he was worried that changes to the appearance of U.S. currency would somehow diminish the value of his cash savings.  Ciccolini also does not explain why he kept over $1 million in cash in his room during a time when he had other bank and investment accounts with millions of dollars.  Nor could the Defendant explain why he structured the transactions to avoid the reporting requirements.  Similarly, the Defendant is unable to explain where this large sum of cash came from, other than implausibly claiming he accumulated it through interest and savings.

On April 15, 2004, the Defendant submitted a false U.S. income tax return.  Specifically, Ciccolini stated that his personal income for 2003 was $101,064, whereas his total income for that year was at least $508,126.  After an investigation by the Internal Revenue Service, it was determined that the Defendant had under-reported his taxable income from 2002 through 2005 by $945,635 and that he owed $292,136 in unpaid taxes.  26 U.S.C. § 7206(1).  On May 11, 2010, the Defendant provided the government with a cashier's check, payable to the Internal Revenue Service, in the amount of $292,136 as payment of back-taxes.

On October 6, 2010 – approximately three weeks before his sentencing – United States Probations received a letter from Timothy J. Killian, President of the Interval Brotherhood Home Foundation.  The letter stated that in July 2008, Defendant Ciccolini admitted to the Interval Brotherhood Home that he was under federal criminal investigation and that he had also embezzled $1,288,683 from the Foundation between 2000 and 2007.  The letter, and later investigation by Probations, showed that Ciccolini embezzled funds that had been gifted to the Interval Brotherhood Home.  Local contractors would donate their services to Interval Brotherhood Home, performing needed repair or construction work for no charge.  Ciccolini then recorded an entry into the books

Case No. 5:10-CR-00290
Gwin, J.

of the Foundation, indicating that the Foundation paid the contractors for their services. Ciccolini

would then draw a check on Foundation funds – usually made payable to a financial institution – and

then would convert that check into cash. Some of the funds from these checks were deposited

directly into his bank accounts, but Ciccolini also retained a significant portion as cash. After

admitting this scheme to the Foundation, Ciccolini repaid the Foundation the $1,288,683.

After learning that Ciccolini had admitted embezzling Foundation funds and that he had also

singly accumulated more than $5 million in a sole-directed trust, the Probations Department

conducted a further investigation of Ciccolini's finances. The Probation Department investigation

revealed that Defendant Ciccolini possessed significant assets–far outstripping any sums he may

have accumulated through legitimate means. At the time of his sentencing, Ciccolini owned a

Charles Schwab trust account with $5.2 million–mostly in cash–and separately held $385,973 in

deposits at FirstMerit Bank. Bank records show Ciccolini opened the Charles Schwab account in

2008 and that most of the deposits into this account were made in the form of cash, cashier's checks,

or as wire transfers from other bank accounts. The Schwab trust account had only limited equities,

although it included shares of FirstEnergy stock. It primarily held various municipal bonds, cash

equivalents, and government bonds with only limited income flows. At the time of his sentencing,

Ciccolini held over $5,590,313 in cash, stocks, and bonds, even after repaying $1,288,683 to the

Foundation and after having paid $292,136 in back-taxes earlier in 2010.

The Defendant's holdings at the time of the offense conduct in 2003 and 2004 are less clear,

although bank records indicate that his FirstMerit bank account had more than $2 million and we

also know Ciccolini had more than $1.1 million cash in his room at the rectory – money he used to

illegally structure the financial transactions. In 2008, Ciccolini opened the Schwab trust account,

Case No. 5:10-CR-00290
Gwin, J.

and an analysis of the funding of that account indicates that most of the $5 million was accumulated by 2004.  To fund the Schwab account in 2008, in June 2008, Ciccolini transferred $586,144 of cash and $420,000 of stocks from another account.  He followed this in July 2008 with a cash deposits of nearly $750,000 and in August with another cash transfer of $734,000 from another account.  That September he then transferred an additional $1.2 million cash together with $1.9 million of stock and bonds.  He followed these in November 2008 with a cashier check deposit of $252,000.  Finally, in December 2008, he transferred $1.65 million of municipal bonds together with an additional $178,000 cash to the account.   Apart from one equity holding, the overwhelming majority of the transfers to the Schwab account were conservative money or bond accounts that did not accumulate significant interest.

Defendant Ciccolini's vast wealth is impossible to legitimately explain.  Ciccolini grew up in very modest circumstances – his father, a music teacher, died when Ciccolini was fourteen years old.  His mother first worked as a housekeeper before working as a technician.  He had six siblings.  Ciccolini entered the seminary at 18, was ordained in 1969 and by 1986 he was only earning an after-tax income of only $25,700.  Presumptively, he earned even less before as a young parish priest.  Even assuming that Ciccolini earned the same 1986 salary from 1970 to 1986, he would have received only about $1.2 million in after-tax income from 1970 to 2004 and would only have received after-tax income of about $1.5 million through 2009.  Moreover, the Defendant made his own significant charitable donations, especially to the Interval Brotherhood Home Foundation.  Through 2004, the Defendant donated about $670,000 of his salary to the Interval Brotherhood Home and by the end of 2007, his donations reached almost $900,000.  A rough calculation reveals that after these donations, at best, the Defendant could have legally accumulated a few hundred

Case No. 5:10-CR-00290
Gwin, J.

thousand dollars of earnings over his entire lifetime.

Ciccolini also says that he received gifts and bequests, which he claims help explain his current assets. Ciccolini identifies only approximately $75,000 in gifts that he received before 1999. In all, the Defendant claims to have received about $330,000 in gifts over the course of his tenure at Interval Brotherhood Home, with a total value of gifts through 2004 of about $230,000. In addition, the Defendant also received from his mother as an inheritance now worth approximately $576,000. Included in this inheritance are a $230,000 life insurance policy, and a home worth $101,000. The inheritance also includes 6,232 shares of FirstEnergy, worth approximately $218,000 at the time of the transfer and worth $245,000 at the time of sentencing.

The Court is not, however, persuaded that the inherited assets were all legitimately acquired. Rather, the Court believes that the funds used to make these purchases were also embezzled by Ciccolini – the only plausible explanation why a mother with six children would leave all her assets to the one child without children of his own and who obviously has no need for the bequest. Most likely, these purchases were made as a means of laundering funds that the Defendant embezzled from the Interval Brotherhood Home Foundation. However, for the purposes of these calculations, the Court gives Ciccolini the benefit of the doubt and will count all of these assets as legitimate.

An approximate calculation of the Defendant Ciccolini's legitimate after-tax earnings and inheritance to the time of sentencing totals about $1,506,000. By the end of 2003, his total legitimate earnings and inheritance totaled about $1,336,000. These figure fall far short of the $5,590,313 in liquid assets that Ciccolini accumulated by the time of his sentencing. Thus, even under the Court's generous calculations, it is quite clear that Ciccolini is unable to legitimately account for about $4,500,000.

Case No. 5:10-CR-00290
Gwin, J.

However, with the exception of the $1,288,683 that he already admitted to embezzling from the Interval Brotherhood Home, Ciccolini denies that any of the money is derived from criminal activity. Instead, says that because he lived at the Immaculate Conception Church rectory he had no personal expenses and was able to save all of his earnings. Additionally, he says that because he was saving all of his money that his savings gained significant compounding interest over a thirty-year period.

However, for a number of reasons, Ciccolini's arguments make little sense. First, although Ciccolini had fewer personal expenses than most people, his financial records show that he purchased life insurance policies with a face value of $1,351,036. The cash value of these policies exceeds $100,000. Ciccolini's expense associated with these policies was significant and would have reduced his savings. Second, Ciccolini says that he held large amounts of cash, at least $1.1 million, in his room. Obviously, these funds could not earn any return. Further, available bank statements also show that Ciccolini invested conservatively and achieved only modest returns. For example, in December 2003, Ciccolini had $845,034 in a FirstMerit account. Making up that account, he owned a $12,500 CD; had $61,252 in a savings account; and kept $770,657 in a performance checking account. Through December 2, 2003, Ciccolini had earned $2,790 year-to-date interest on the $845,034 account. By September 2006, and after certain withdrawals, the FirstMerit account balance was $663,674. Then during October 2006, four CDs each worth $333,912 were placed in the account together with a fifth CD worth $379,077. Each of the CDs were in Ciccolini's name but were payable on his death to one of his siblings. Each CD paid 5.22% interest and each CD earned roughly $17,000 in yearly interest. Although 5% interest on $1.3 million will achieve approximately $86,000 in yearly return, it is obvious that return will not grow

Case No. 5:10-CR-00290
Gwin, J.

Ciccolini's salary to over $5 million.  Nothing in his financial records suggests that Ciccolini achieved assets of more than $5 million through compounding interest.

The obvious inference, especially given Ciccolini's admission that he embezzled at least $1.28 million, is that these additional unexplained funds were also embezzled from the Interval Brotherhood Home.  Indeed, the Court finds that under a preponderance standard that it may safely conclude that Defendant Ciccolini embezzled at least $4,000,000 from Interval Brotherhood Home beyond the $1,288,683 that he already admitted to stealing.  *See United States v. Mayle*, 334 F.3d 552, 557 (6th Cir. 2003) (preponderance standard should be used unless the evidence will alter the statutory range of penalties); *United States v. Graham*, 275 F.3d 490, 517 n.19 (6th Cir. 2001) (same).  Additionally, the Court also finds that most of the $4.5 million was embezzled prior to 2006.  In 2006, the Interval Brotherhood Home first began undergoing audits from an outside accounting firm.  A letter mailed to the Court from this firm indicated that there were no financial irregularities in the Foundation's records for the years of 2006, 2007, 2008, and 2009.  Thus, it is likely the lion's share of the embezzlement occurred before these audits took place.  With those findings in mind, the Court proceeds to determine an appropriate sentence.

## II.  Legal Standard

Following *United States v. Booker*, 543 U.S. 220 (2005), the sentencing guidelines are now advisory.  In reaching a sentencing determination, a district court in the Sixth Circuit  considers the parties' arguments, the advisory guidelines range, and the other relevant 18 U.S.C. § 3553(a) factors. *United States v. Jones*, 489 F.3d 243, 250-51 (6th Cir. 2007); *United States v. Jones*, 445 F.3d 865, 869 (6th Cir. 2006).

In determining a sentence, a district court must begin the process by calculating the advisory

Case No. 5:10-CR-00290
Gwin, J.

guideline range suggested by the United States Sentencing Commission. *Rita v. United States*, 551 U.S. 338, 351 (2007) ("The sentencing judge . . . will normally begin by considering the presentence report and its interpretation of the Guidelines."). In so doing, the Court must determine the offense level for the crimes for which the defendant has been convicted and the defendant's criminal history.

Second, a sentencing court must independently evaluate each of the factors in 18 U.S.C. § 3553(a), which details the considerations that a district court must weigh before sentencing a criminal defendant. Although the Guidelines form a starting point in the district court's analysis under 18 U.S.C. § 3553(a), a district court may not presume that the sentence suggested by the Guidelines is appropriate for an individual criminal defendant.  After reviewing the section 3553(a) factors, under the "parsimony provision," district courts must ultimately "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in section 3553(a)(2).  18 U.S.C. § 3553(a); *see also United States v. Foreman*, 436 F.3d 638, 644 n.1 (6th Cir. 2006). Ultimately, a court must exercise its independent judgment in sentencing a defendant.

Consistent with *Booker* and its progeny, the Court first determines the advisory guidelines range and then considers the applicable § 3553(a) factors to determine an appropriate sentence.

### III.  Analysis

*III.A  Guidelines Range Calculation*

The Court begins by calculating Defendant Ciccolini's sentence under the 2009 advisory sentencing guidelines.  The Court has compared the 2003 and 2004 editions of the sentencing guidelines and finds that they produce the same offense level computation.

On the first count–structuring financial transactions in violation of 31 U.S.C. § 5324(a)(3) – the Court looks to § 2S1.3.  U.S.S.G. § 2S1.3.  The Court finds that the funds used in this specific

Case No. 5:10-CR-00290
Gwin, J.

offense were the proceeds of criminal activity.  Accordingly, under § 2B1.1 sixteen levels are added

to the base level of six, resulting in a base offense level of twenty-two.  U.S.S.G. § 2B1.1.

The Defendant admits that the $1,038,680 deposited in 2003 as part of this offense was

stored in his room at the rectory.  The Defendant also admits to embezzling $1,288,683 from the

Interval Brotherhood Home Foundation from 2000 to 2007 and stated during his sentencing that

some of these embezzled funds were held in cash in his room.  Additionally, as previously stated,

the Court finds that the Defendant embezzled at least an additional $4.5 million prior to 2006 in

addition to the $1,288,683 he admitted embezzling from the Foundation.  Presumably, the Defendant

also held portions of those funds in cash in his room.  Thus, the "fund" from which the structured

bank deposits were made contained both clean money–from the Defendant's income and gifts–and

dirty money–embezzled from the Interval Brotherhood Home.

Although there is not clear Sixth Circuit case law on whether the government must prove that

all of the specific funds used are derived from criminal activity, the Court finds that the Seventh

Circuit took the best path in _United States v. Haddad_, 462 F.3d 783 (7th Cir. 2006).  In that case, the

Defendant was charged with money laundering in violation of 18 U.S.C. § 1957.  The Defendant

spent over $10,000 from an account that contained criminal activity tainted and clean funds.  The

Seventh Circuit found that the government did not need to prove that the specific dollars used in the

transaction were dirty, so long as the bank account contained sufficient dirty funds to cover the

amount of the charged conduct.  462 F.3d at 791-92.  See also _United States v. Davis_, 226 F.3d 346,

356 (5th Cir. 2000) ("Obviously, when tainted money is mingled with untainted money in a bank

account, there is no longer any way to distinguish the tainted from the untainted because money is

fungible."); _United States v. Baker_, 227 F.3d 955, 965-66 (7th Cir. 2000) (applying this line of cases

-10-

Case No. 5:10-CR-00290
Gwin, J.

to sentencing under § 2B1.1); *United States v. Ward*, 197 F.3d 1076, 1083 (11th Cir. 1999); *United States v. Moore*, 27 F.3d 969, 977 (4th Cir. 1994) ("To satisfy this burden where the funds used in the particular transaction originated from a single source of commingled illegally-acquired and legally-acquired funds or from an asset purchased with such commingled funds, the government is not required to prove that no 'untainted' funds were involved, or that the funds used in the transaction were exclusively derived from the specified unlawful activity."); *United States v. Johnson*, 971 F.2d 562, 570 (10th Cir. 1992); *United States v. Jackson*, 935 F.2d 832, 840 (7th Cir. 1991). Although all of these decisions were in the context of money laundering, the Court finds the rationale should also apply here. The Defendant held sufficient amounts of embezzled funds in cash to cover the entire value of the deposits made. Due to the fungible nature of money, the government should not be required to prove that all of specific dollars deposited were derived from criminal conduct. Therefore, the Court finds that the structured funds were criminally derived and concludes that the appropriate base offense level is twenty-two. U.S.S.G. § 2S1.3.

The Court also finds that the Defendant obstructed justice and should therefore receive a two-level increase in his offense level under § 3C1.1. U.S.S.G. § 3C1.1. During his plea colloquy, the Defendant testified that none of the money deposited was stolen or otherwise the product of illegal conduct. However, the Court finds that most – if not all – of the deposited money was in fact embezzled from the Interval Brotherhood Home. Under the sentencing guidelines, providing "materially false information to a judge" is obstruction of justice. U.S.S.G. § 3C1.1, Comment 4(f). The Court, therefore, increases the Defendant's base offense level two points. The Defendant's final adjusted offense level for this offense is twenty-four.

On the second count – making false tax returns under 26 U.S.C. § 7206(1) – the Court finds

-11-

Case No. 5:10-CR-00290
Gwin, J.

that the base offense level is eighteen.  U.S.S.G. § 2T4.1(G).  Additionally, because the unreported

income derives from criminal activity, the Court finds that a two-level enhancement applies under

§ 2T1.1(b)(1).[1/]  U.S.S.G. § 2T1.1(b)(1).  Thus, the Defendant's final adjusted offense level for the

tax offense is twenty.

Under § 3D1.4, the Court finds that the combined adjusted offense level is twenty-six.[2/]

U.S.S.G. § 3D1.4.  The Court concludes that the Defendant should not receive a reduction under §

3E1.1 for acceptance of responsibility, even though he pled guilty to both counts of the information.

U.S.S.G. § 3E1.1.  The sentencing guidelines note that "[c]onduct resulting in an enhancement under

§ 3C1.1 . . . ordinarily indicates that the defendant has not accepted responsibility for his criminal

conduct."  U.S.S.G. § 3E1.1, Comment 3.  The Defendant's obstruction of justice, as well as his

general unwillingness to admit wrongdoing – both to the Court and to Probations – warrants denying

the two-level reduction for acceptance of responsibility.  Therefore, the final combined adjusted

offense level is twenty-six.

Since the Defendant has no criminal history category points, his criminal history category is

I.  An offense level of twenty-six and a criminal history category of I yields a suggested guidelines

range of sixty-three to seventy-eight months imprisonment.  The Court finds that there are no

grounds for a departure from this calculation, because the offense conduct here falls within the

heartland of those offenses envisioned by the Sentencing Commission when drafting the Guidelines.

---

[1/] The Court finds that the Defendant occupied a position of trust with regard to the Interval Brotherhood Home.
However, the Court finds that the two-level enhancement is not applicable under § 3B1.3 because the direct victim of
this offense was the United States government, and not the Interval Brotherhood Home.  Therefore, the Court finds that
this enhancement is not appropriate.  *See United States v. Young*, 266 F.3d 468, 478 (6th Cir. 2001) (applying this
enhancement to a money laundering charge where the defendant stood in a position of trust with the actual victim).

[2/] During the sentencing hearing, the Court erroneously noted that the final combined adjusted offense level was
twenty-four.  The adjusted offense level calculated in this opinion is correct.  This difference also affects the final
suggested guidelines range. The range calculated in this opinion is the correct figure.

Case No. 5:10-CR-00290
Gwin, J.

*III.B   3553(a) Factors and Payment of Restitution*

The Court must next consider the factors set forth in 18 U.S.C. § 3553(a) and must offer a reasoned explanation for its final sentence.  Under 18 U.S.C. 3553(a),[3/] the Court must consider:  the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the applicable advisory Guidelines range; relevant policy statements by the Sentencing Commission; the need to avoid unwarranted sentencing disparities; and the need to provide restitution to victims.  18 U.S.C. § 3553(a); *United States v. Cousins*, 469 F.3d 572, 576 (6th Cir. 2006) (emphasis added).  After considering these factors, the Court must impose a sentence that takes into account the statutory purposes in § 3553(a)(2), specifically, the need for the sentence to: (A) reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) afford adequate deterrence to criminal conduct; (C) protect the public from further crimes of the defendant; and (D) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a)(2).

In considering the nature and circumstances of the offense, the Court finds that the Defendant was the founder and executive director of Interval Brotherhood Home and Foundation.  The Interval

---

[3/] The section 3553(a) factors include:
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed–
    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
    (B) to afford adequate deterrence to criminal conduct;
    (C) to protect the public from further crimes of the defendant; and
    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) . . . the [guidelines] sentencing range . . . ;
(5) any pertinent policy statement issued by the Sentencing Commission . . . ;
(6) the need to avoid unwarranted sentence disparities . . . ; and
(7) the need to provide restitution to any victims of the offense.

Case No. 5:10-CR-00290
Gwin, J.

Brotherhood Home is a not-for-profit corporation that provides drug and alcohol treatment to local

residents.  The Defendant had nearly sole and exclusive control over the finances of the Interval

Brotherhood Home and Foundation until 2008 and used that position to embezzle funds.  The

Defendant used a relatively elaborate scheme to falsely record invoices from people who made

donations to the Foundation and then take that money for his own purposes.  He often stored that

money as cash in his room at the rectory.  He also used the embezzled funds in the 2003 structured

financial transactions.

Before the offense conduct, the Defendant's after-tax income and gifts, minus the donations

he made, was about $760,000.  At the time of his sentencing, his after-tax income and gifts, minus

the donations he made is approximately $930,000.  The Defendant also received an inheritance from

his mother worth about $576,000.  In all, the Defendant can currently account for about $1.5 million

in legitimate funds through 2010 and can account for approximately $1.3 million in legitimate funds

through 2004.  Yet, these accounted-for funds fall far short of the $5,590,313 currently held by the

Defendant.  The Court finds that the Defendant embezzled at least $4.5 million from the Interval

Brotherhood Home beyond the $1,288,683 that he already confessed to stealing.

With regard to Defendant Ciccolini's personal characteristics, he is sixty-eight years old and

is an ordained priest.  He entered seminary in 1960, when he was eighteen, and was ordained in

1969.  Despite his financial crimes, he has given great service to the Akron community.  He has no

prior criminal convictions.  He has a relatively serious heart condition, painful dental conditions, and

is a smoker with the accompanying health conditions.  He has no substance abuse problems.  Despite

the large amount of wealth he has accumulated, Defendant Ciccolini lives simply with no significant

purchases, no vacations, and no untoward expenditures.  The Court does find that the Defendant

Case No. 5:10-CR-00290
Gwin, J.

might suffer from a potentially undiagnosed psychological disorder that may have led him to horde

such large sums of cash in his room.

The Court considers the applicable guidelines range and the various sentences now available.

As previously noted, the Court finds that the applicable Guidelines-recommended range is sixty-three

to seventy-eight month's imprisonment. The Court may also order a fine of up to $250,000 on the

structuring count and up to $100,000 on the tax fraud count. 18 U.S.C. § 3571; 26 U.S.C. § 7206(1).

The Court may also order supervised release of not less than one year, but not more than five years.

18 U.S.C. §§ 3561(a)(1-3) & (c)(1). The Court may also order an award of restitution, per 18 U.S.C.

§ 3663, to the victims of the offense conduct. The Court notes that the Defendant has already paid

the Internal Revenue Service $292,136 in back-taxes and has repaid the Interval Brotherhood Home

the $1,288,683 he admits to embezzling.

The Court also considers the need to avoid unwanted sentencing disparities. However, it is

generally difficult, given the dearth of information available, to determine whether a particular

sentence may create a disparity. Nonetheless, the Court considers this factor. The Court also

considers any relevant policy statements or guidance issued by the Sentencing Commission.

The Court also considers the need to provide restitution to the victims of the offense and the

statutory purposes listed in § 3553(a)(2). In this case, these two particular considerations are closely

related. As described in § 3553(a)(2), the Court essentially serves four purposes in sentencing: (1)

deterring others from similar conduct; (2) deterring the offender from reoccurrence of the conduct;

(3) rehabilitating and incapacitating the offender; and finally (4) imposing society's retribution for

conduct that violates the law.

The Court finds relative to individual deterrence, that there is little likelihood that the

Case No. 5:10-CR-00290
Gwin, J.

Defendant will re-offend in a similar manner.  Similarly, relative to incapacitation, the Court finds

that there is little to suggest that rehabilitation is an important consideration.  Relevant to both, the

Defendant has been removed from the position of trust at the Interval Brotherhood Home and

Foundation and the post-release supervision should prevent future reoccurrence of the same or

similar conduct.

The Court finds that general deterrence is a more difficult consideration here.  Requiring

individuals to truthfully report their income is crucial to the continued operation of our government.

The funding of public programs depends upon continued tax revenues and sufficiently severe

punishments must be meted out to deter individuals from misstating their income on tax returns.

Similar considerations apply with regard to the bank structuring offense.

In crafting a punishment that will most adequately deter similar conduct by other individuals

in the future, the Court is influenced by the writings of Nobel Prize winning economist Gary Becker.

In his seminal article on crime and punishment,[4] Professor Becker recommends more emphasis on

fines – and less on incarceration – for many white-collar or financial offenses.  Becker theorizes that

in financial crimes the incarceration of the specific offender is less important than providing a

disincentive to future offenders through financial penalties.  The Court generally agrees with these

propositions and finds them persuasive here.  *See United States v. Turner*, 998 F.2d 534, 535 (7th

Cir. 1993) (agreeing with Becker's theory that fines are often an effective means of increasing

deterrence).  With Becker's theory in mind, the Court finds that imposing a financial penalty in the

current case, rather than prison time, will adequately deter future financial crime.

Related to using a financial penalty to serve as a general deterrent is the need to impose

---

[4] Gary Becker, *Crime and Punishment: An Economic Approach*, *in* Essays in the Economics of Crime and Punishment 1, 24-34 (Gary S. Becker & William M. Landes, eds., 1974).

Case No. 5:10-CR-00290
Gwin, J.

restitution to the victims of the offense.  In reality, the Interval Brotherhood Home and its supporting

foundation are the true victims of this offense.  The Defendant attempts to paint the offense conduct

– structuring financial transactions and tax evasion–as entirely separate from the embezzling of

millions of dollars from the Interval Brotherhood Home.  Likely, Ciccolini saw the Foundation as

being rich in surplus funds – funds he could largely attribute to his own efforts–and he felt that

stealing a fraction of the total surplus was acceptable.  Despite the fact that Ciccolini's theft did not

impact the Interval Brotherhood Home's programming, the money taken remains the Foundation's

property.  The Court finds that the offense conduct associated with the structured financial

transaction charge and with the tax charge was an attempt by the Defendant to hide the enormous

sums of money that he was embezzling.  In this regard, this case looks quite similar to a money

laundering situation where the defendant is laundering money as a means of concealing the

underlying criminal activity that produced the laundered money.  The Foundation is the ultimate

victim of the Defendant's scheme to defraud and embezzle, and the charged offense conduct is

merely one component of that greater illegal scheme.

A federal district court has "no inherent authority to order restitution, and may do so only as

explicitly empowered by statute." *United States v. Hensley*, 91 F.3d 274, 276 (1st Cir. 1996).  Under

18 U.S.C. § 3663(a), a court, "when sentencing a defendant convicted of an offense[,] . . . may order

. . . that the defendant make restitution to any victim of such offense." 18 U.S.C. § 3663(a)(1).  That

statute defines a "victim"broadly as "a person directly and proximately harmed as a result of the

commission of an offense for which restitution may be ordered including, in the case of an offense

that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly

harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."

Case No. 5:10-CR-00290
Gwin, J.

18 U.S.C. § 3663(a)(2).

Although there is some split in authority, the Court believes that restitution may be ordered to the Interval Brotherhood Home and Foundation because the Home and Foundation were proximately harmed by Ciccolini's scheme to embezzle, of which the charged conduct was a part. In *Hughey v. United States*, the Supreme Court interpreted 18 U.S.C. § 3580, the predecessor statute to 18 U.S.C. § 3663.  495 U.S. 411 (1990).  In *Hughey*, the defendant was charged with three counts of theft by a postal service employee and three counts of unauthorized use of credit cards.  *Id.* at 414-15.  The defendant pled guilty to one count of an indictment that charged him with using one of the credit cards at issue with intent to defraud.  *Id.*  The district court ordered the defendant to pay restitution for all of the charged conduct, even though the defendant pled guilty to only one of the count.  *Id.*  In reversing that restitution order, the Supreme Court interpreted the term "offense" in § 3580 narrowly, writing that "Congress intended restitution to be tied to the loss caused by the offense of conviction . . . Indeed, had Congress intended to permit a victim to recover losses stemming from all conduct attributable to the defendant, including conduct unrelated to the offense of conviction, Congress would likely have chosen language other than 'the offense,' which refers without question to the offense of conviction."  *Id.* at 418-419.

In *Hughey*, the Supreme Court seemed to foreclose orders of restitution that strayed beyond harm directly caused by the charged conduct.  *Id.*  ("Section 3580(a) hence confirms, rather than undermines, our conclusion that the loss caused by the conduct underlying the offense of conviction establishes the outer limits of a restitution order.").

However, the Sixth Circuit has generally interpreted 18 U.S.C. § 3663(a) more broadly than a purely mechanical application of *Hughey*.  Indeed, its interpretations of the terms "offense" and

-18-

Case No. 5:10-CR-00290
Gwin, J.

"victim" allow orders of restitution for offense conduct that, although not specifically charged, is directly related to the conduct that is charged.  In *United States v. Jewett*, 978 F.2d 248, 252 (6th Cir. 1992), the defendant was charged with mail fraud.  The Sixth Circuit interpreted the term "offense" to cover all conduct that was part of the charged "fraudulent scheme." Under this reading, all of the fraudulently acquired money could be subject to a restitution order, rather than only those losses caused by the two specifically charged mailings.  *Id.*  The *Jewett* Court reasoned that the entire scheme to defraud was part of the charged "offense" and was therefore subject to restitution.

In that decision, the Sixth Circuit also recognized that the 1990 amendments to 18 U.S.C. § 3663(a)(2) superseded *Hughey*, since the Supreme Court was interpreting an older version of the statute.  *Id.* at 253.  The 1990 Amendments to the statute expanded the definition of "victim" to "any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."  *Id.* (quoting 18 U.S.C. § 3663(a)(2)).  More recently, the Sixth Circuit returned to the meaning of the term "victim" in *United States v. Carpenter*, 359 F. App'x 553, 559 (6th Cir. 2009). In *Carpenter*, the Sixth Circuit reviewed an order of restitution against a defendant convicted of fraud.  When calculating restitution owed, the court included checks sent by two companies owned by the defendant that were not themselves included or listed in the counts of mail fraud.  The Sixth Circuit upheld the restitution after finding that those companies were also involved in the fraudulent scheme, even though they were not listed in the charged counts.  *Id.*  The individuals swindled by those companies were also "victims" of the charged conduct under § 3663 and the checks sent by those companies were included in the restitution calculation.  The court wrote that the amended version of § 3663 "expanded the definition of victim in cases such as mail fraud and authorized restitution for all losses attributable to the defendant's scheme to defraud." *Carpenter*, 359 F. App'x

-19-

Case No. 5:10-CR-00290
Gwin, J.

at 559 (citing *Jewett*, 978 F.2d at 252).  The court went on to state that *Hughey* "does not apply to

the amended version of [§ 3663]" and stated that "restitution orders [may] take into account losses

attributable to a fraudulent scheme as a whole."  *Carpenter*, 359 F. App'x at 559; *see also United

States v. Coffee*, 110 F. App'x 654, 656 (6th Cir. 2004) ("Restitution is not confined to harm caused

by the particular offense of conviction") (upholding restitution award for fraudulent conduct related

to specifically charged conduct).

Courts in other circuits have also been willing to order restitution under § 3663 for harm that

is more broadly part of the charged conduct.  For example, in *United States v. Boyd*, the Second

Circuit held that a co-conspirator could be held liable for restitution for reasonably foreseeable acts

committed by other co-conspirators.  222 F.3d 47, 51 (2d Cir. 2000).  Similarly, the Ninth Circuit

also recently upheld a restitution award of over $1 million where defendant admitted to being

involved in a broader reaching fraudulent scheme, but only actually pled guilty to one count that

itself had about $4,500 in loss.  *United States v. Lam Thanh Pham*, 294 F. App'x 330,  334 (9th Cir.

2008).[5]

The Court finds that this case law – particularly *Carpenter* – allows for a restitution order that

takes the Defendant's entire criminal conduct into account where non-charged conduct is closely

related to the charged conduct.  Thus, as part of its sentence, the Court orders that the Defendant pay

restitution to the Interval Brotherhood Home Foundation in the sum of $3,500,000.  Although this

---

[5]  However, even despite these holdings, courts outside of the Sixth Circuit have not been as willing to state
that *Hughey* was superseded by the 1990 amendments to § 3663.  *See, e.g., United States v. Morrison*, 685 F. Supp.2d
339, 342-43 (E.D.N.Y. 2010) ("Although *Hughey* involved the pre-amendment version of the VWPA, courts have
extended its analysis to the amended version of that statute . . . While the language expands what it is that will give rise
to a compensable loss when a scheme, conspiracy or pattern is involved, the reference point to which such conspiracy
is tied remains the 'offense' of which the defendant has been convicted . . . Although the definition of victim is certainly
broad, in determining whether one qualifies as a victim, a sentencing court can only consider the offense or offenses for
which the defendant was convicted.")

Case No. 5:10-CR-00290
Gwin, J.

is a cautious estimate and likely understates the amount embezzled, the sum is a significant portion of the money that was embezzled by the time the offense conduct occurred in 2003 and 2004. The Court concedes that this restitution order is somewhat unusual. Both *Carpenter* and *Jewett* deal with situations where a defendant was charged with fraud and a restitution order was issued covering conduct not itself charged, but that was part of the same fraudulent scheme. Here, the money that was stolen from the foundation is somewhat less related to the charged offenses of structuring financial transactions and tax evasion. However, the Court views the rationale underlying those decisions and Congress's amendment of § 3663 as supporting an order of restitution. The charged offense conduct here was designed to conceal and support the broader scheme of embezzlement and can fairly be viewed as part of the same offense conduct.

The Court finds that imposing a restitution order serves the dual purpose of general deterrence under § 3553(a)(2) – i.e. imposing a monetary fine for a financial crime – and also serves the purpose of providing restitution to the victims of the offense conduct under 18 U.S.C. § 3553(a)(7). Thus, the Court views a significant fine together with a restitution order, rather than prison time, as the most effective and just punishment in this case.

**IV. Conclusion**

After a thorough consideration of the parties' arguments, the advisory guidelines range, and the other relevant 18 U.S.C. § 3553(a) factors, the Court choose to fashion a non-guidelines sentence. The Court finds that a sentence of one day imprisonment, a fine of $350,000, and a restitution order of $3,500,000 reflects the seriousness of the offense, promotes respect for the law, provides just punishment for the offense, affords adequate deterrence to criminal conduct, and protects the public from further crimes of the Defendant. *See* 18 U.S.C. § 3553(a)(2). The Court

Case No. 5:10-CR-00290
Gwin, J.

also orders a three-year term of supervised release and a special assessment of $200.

       IT IS SO ORDERED.


Dated: November 11, 2010               s/      *James S. Gwin*
                                           JAMES S. GWIN
                                         UNITED STATES DISTRICT JUDGE